MERRILL (AIREY v.). See Case No. 115.

## Case No. 9,468.
### MERRILL v. AREY.
[2 Ware, 215.] [1]

District Court, D. Maine. March, 1859.[2] [3]

SHIPPING—CHARTER PARTY—DANGERS OF THE SEA —FIRE—INDEMNITY.

1. Where by the terms of a charter-party the hirers of a vessel covenanted to return her on the expiration of the service in like good condition as when she sailed, ordinary wear and the dangers of the seas excepted, the risk of a loss by fire is on them.

2. "Dangers of the seas" include only those which accrue from the action of the elements, and such as are incident to that cause, rather than all that arise on the sea. An accidental fire is not one of the peculiar dangers of the sea.

3. In all contracts, both for service performed, and for dangers assumed by the way of bottomry or insurance, the maritime law gives full indemnity, but no more.

[Cited in Isaksson v. Williams, 26 Fed. 644.]

In admiralty.

Mr. Merrill, for libellants.
Shepley & Dana, for respondents.

WARE, District Judge. This is a libel on a charter-party. The libellants, being the owners of the schooner William Henry, of the burthen of 130 tons, on the 17th of February, 1853, let her to the respondents, by the charter-party, for two or three voyages, at the option of the hirers, from Frankfort to the Chesapeake Bay, or any other Southern

---

[1] [Reported by George F. Emery, Esq.]

[2] [Affirmed in Case No. 115.]

[3] This case, though appearing by the manuscript to have been decided in 1859, was determined in 1854, and the decree of the district court was affirmed by the circuit court at September term, 1854.

port or ports, for the monthly charter of $150. By the terms of the contract, the hirers were to victual, man, and sail the vessel, at their own charge, and to return her at the expiration of the service, to the owners, in the like good condition as when they took her, ordinary wearing and the dangers of the seas only excepted. She soon after took in a cargo of ice and sailed from the Penobscot on the first of March, for Pensacola. According to the testimony of the respondents the vessel was found to leak some, but not badly, soon after getting to sea, but about ten or eleven days after sailing the leak increased, either from an injury to the vessel from striking some heavy, floating body in the water, or from the increased violence of the sea. In the condition in which the schooner then was, the master did not think it safe to prosecute the voyage to Pensacola, and he bore away and put into Norfolk for repairs. He then made a protest, and called a survey of the vessel. It was found that the ice had been considerably wasted by the influx of sea water, and the cargo had shifted, and the surveyors advised to unload her and sell her cargo, in order to a more full examination of her hull. This was accordingly done, and on an examination some trifling repairs were made, at an expense of something over twenty dollars. The outward cargo for Pensacola having been sold, the voyage was abandoned. After remaining at Norfolk about ten days, the master sailed for Baltimore, with a light, southerly wind, and fair weather, passed Point Comfort about dark, and though varying his course from time to time, in order to keep in the deep water of the channel, struck on the Tangier shoals about midnight. After lying there through one tide, about a mile and a half from the shore, and attempting without success to get the vessel off, the master, with the crew, left in the boat early in the afternoon, and went ashore. They returned in the course of the afternoon and took some articles from the vessel and left her for the night, towards the close of the afternoon. The next morning the schooner was discovered to be on fire, and when the master and crew arrived in the boat, she was burned from stern to midship. Some of the sails and rigging were saved, but the hull of the vessel was entirely destroyed. The schooner was insured for $1500, and valued in the policy at $3000. The insurance has been paid.

A large amount of testimony has been taken relative to the conduct of the master before the vessel arrived at Norfolk, to the transactions there, to the master's conduct after leaving Norfolk in going up to the Chesapeake, and his leaving the vessel after she struck on the shoal, from all which the counsel for the libellants infers, that there was gross negligence, if not criminal misconduct, on the part of the master, while the counsel for the respondent contends that no fault is justly imputable to him, but that throughout the whole he acted with reasonable discretion and prudence, and that the loss of the vessel was a pure misfortune for which the hirers are no way responsible.

In the view which I have taken of the case, I have not thought it necessary to enter into a minute examination of this testimony. By the general principle of the law of hiring of things, the hirer is bound to take the same care for the preservation of the thing that a prudent man takes of his own property of a like nature, under like circumstances. Story, Bailm. §§ 398–400. It is a contract of mutual interest. The hirer is benefited by the use of the thing, and the lender by the hire or rent paid. The hirer is not liable, as a common carrier, for a loss by every sort of accident, except by the act of God, neither is he bound for that extreme care and diligence, that one is, who has the use of a thing by a gratuitous loan and the whole benefit of the contract is on one side, and the burthen on the other. But he is responsible not only for his own diligence, but for that of his servants, to whom the thing is entrusted. If this, therefore, had been an ordinary contract of hiring, and to be governed by the common principles of the law applying to this contract, the inquiry into the conduct of the master and crew would become very material. But the liabilities of the hirer may be varied or enlarged by the terms of the contract; and the agreement by which this vessel was hired, was special. She was hired by a charter-party, by which the hirers covenanted to return her on the expiration of the service, to the owners, in like good condition as when she sailed, ordinary wear and the dangers of the seas excepted. Stranding on the shoals is indeed one of the dangers of the sea, but the stranding was not the proximate cause of the loss. In the actual state of the weather, it is, I think, sufficiently apparent from the evidence, that the vessel might have been got off and saved without great difficulty or expense, if she had not been burnt. It may be said that the stranding led to the burning, and was thus the first, and in one sense the efficient cause of the loss. But even this would not have been the case if the master and crew had remained on board; and after all the explanations that have been given, I cannot perceive that the abandonment of the vessel was imperiously called for. It is said, indeed, that there were some indications of a storm, and if one had arisen the vessel must have been destroyed, and the lives of the crew put in jeopardy. But the peril should be imminent and serious that will justify a master in abandoning his vessel. Lying as they did, within a mile and a half of the land, the master might well have remained in the vessel till the danger was more pressing. Without, however, dwelling on these circumstances, the risk of a loss by fire, in my opinion, by the terms of the con-

tract, the hirers took on themselves. Dangers of the seas is somewhat of an equivocal expression. It may, without any 'violation of its natural import, be interpreted to mean, dangers that arise upon the sea, which would include every hazard and danger, from the beginning to the end of the voyage, of whatever kind; or with equal propriety, it may mean only those which arise directly and exclusively from that element, of which that is the efficient cause. Sometimes it is taken in one sense and sometimes in the other. In insurance cases, where the import of this phrase is as often considered as in any other, perhaps oftener, its meaning is not exactly settled. And there may be a difference between the force given to it in this, and other maritime contracts, such as bills of lading and charter-parties; and I am not aware, if this is the case, that it is exactly discriminated. In most cases, the owners of the ship have the possession by their own masters and mariners, for whose conduct they are more or less responsible. But in the present, the charterers had the possession. They equipped her with their own master and men, and had the entire direction of her motions. The exceptions were introduced into the charter-party in their favor. It would, therefore, be natural, and in conformity with the common rule of law, if its meaning were doubtful or ambiguous, to interpret it against them, and in favor of the other party. I think, also, it would be most in harmony with the general inclination of American courts, to interpret this phrase as including only dangers that arise from the action of the elements and the dangers incident to that cause, rather than to include all that arise on the sea. The exception now commonly introduced into insurance policies of loss by fire, shows a doubt, at least among those most conversant with maritime affairs, whether this would come within the common phrase, dangers of the sea. An accidental fire is not certainly one of the peculiar dangers of that element. It may arise on land as well as at sea. Besides, an accidental fire always implies some degree of fault or carelessness among those whose duty it is to prevent it. On the whole, in this case, I do not think that a loss by fire ought to be included in the dangers of the seas, and more especially as the charterers had the possession. This decision is, I think, justified by the principles of law,[4] and is consonant to the decision of the courts.

If it be held that the charterers are liable on this contract, the question arises, for what sum they are liable, whether for the whole value of the vessel, or for such part as is not covered by the insurance. Though this question was not raised in the argument, it is not seen how it is to be avoided, and it is not of easy solution. The schooner was insured for $1500, and this has been paid. Insurance is essentially a contract of indemnity. Where nothing is exposed to loss, it is a mere wager, and it is a well-established principle that this is simply void, and as a consequence, the property at risk, even when valued, may be always a subject of inquiry; though if anything is at risk, the court will incline in favor of the assured. Alsop v. Commercial Ins. Co. [Case No. 262]. In this case, the vessel was at risk, and was of greater value than was assured by the insurers, and as by the terms of the policy, a loss by fire was included, they could make no defence. But on this contract, can the owners recover the full value of the vessel? If they can, so far as the insurance goes, they recover a double indemnity. And this is against the clear policy of the maritime law. But the counsel for the libellants says they recover as trustees for the insurers. What claim have the insurers to this sum since a loss by fire was one which they expressly took on themselves? It seems to me that their mouth is closed. Their own contract, their own words, must raise an insuperable obstacle to their recovery in any form of action, or against any parties. If the owners recover in this action the full value of the ship, in every view which I can take of the case, they will be twice paid to the amount of the insurance. In all contracts, both for service performed, and for dangers assumed by the way of bottomry or insurance, the maritime law scrupulously gives what is due to full indemnity. But it gives no more. It does not permit owners to make a profit out of a common calamity. On the best consideration of the subject, which I have been able to give, I think the owners in this action can recover the whole of value of the schooner above the amount insured, and no more. There were a number of depositions taken as to the value of the vessel. There was a wide and singular discrepancy in the testimony, varying in the estimate of her value from $1000 to $3500. In such a conflict, the court is thrown on its own opinion, to be made up from circumstances about which there is no controversy, and as this case will by appeal be carried to another tribunal, any errors I may commit may be corrected. She was of the burthen

---

[4] The Roman law contains salutary admonitions on this subject. Every fire in a building, if it could be traced to no other cause, was presumed to arise from the negligence or fault of the inhabitants. Plerumque incendia culpa fiunt inhabitantium. Dig. 1, 15, 3, § 1; Dig. 18, 6, 11. And by the Aquilian law, those from whose fault it arose, or whose duty it was to prevent its spreading and ravages, were answerable for the consequences. Dig. 9, 2, 27, §§ 5, 9. The French have adopted this principle from the Roman law, and carried it out with much more efficiency than has been done either by the law of England or this country. 11 Toullier, No. 155 et suivant, in an examination of engagements that are formed without convention, has, with his usual learning and ability, given the history and present state of the French law on this subject, and particularly in No. 179, in vindication of the severity of the law.

of 130 tons, and about seventeen years old, and I have come to the conclusion that she was worth about $2000. The libellants also claim charter for her to the time when she was lost, amounting to $115. This is allowed. Some, also, of the rigging was saved. After all allowances are made, the decree will be that the libellants receive $698, and costs of suits.

[The respondents appealed to the circuit court, where the decree of the court below was affirmed, and it was also decided that, as there was no appeal by the libellant, he could not claim greater damages in this court than those allowed in the district court. Case No. 115.]